313 So.2d 208

**Carl BASS**

**v.**

**STATE.**

**6 Div. 738.**

Court of Criminal Appeals of Alabama.

May 6, 1975.

Anthony M. Falletta, Birmingham, for appellant.

William J. Baxley, Atty. Gen., Montgomery, and Quentin Q. Brown, Jr., Asst. Atty. Gen., Birmingham, for the State.

HARRIS, Judge.

Appellant was convicted of murder in the first degree and sentenced to life imprisonment. Prior to arraignment he was found to be indigent and counsel was appointed to represent him throughout the trial proceedings in the court below. He pleaded not guilty. After conviction he was furnished a free transcript and trial counsel was appointed to represent him on appeal.

The homicide occurred on February 7, 1973, shortly after 8:00 P.M. in front of the A & A Delicatessen, located at First Avenue and Thirty-Fifth Street, North, in Birmingham, Alabama.

The wife of the deceased, Herman Leonard Garland, testified that she last saw her husband alive on Monday, February 5, 1973, when he carried her to Huntsville where she was employed. She further testified that her husband carried several credit cards in his billfold—Gulf Oil Card, Standard Oil Card, Shell Oil Card, and a Sears Revolving Card. She was an aunt to Mrs. Frances Petruzella Clark, who was employed by the A & A Delicatessen which was owned by her mother.

Mrs. Clark testified that the deceased was her uncle and was employed by the ABC Board but he came by the store every night to take the garbage out and help them close the business; that on the night of February 7, 1973, he came to the delicatessen about 7:00 P.M. and carried the garbage out the front door about eight o'clock. While Mr. Garland was out putting the garbage in the cans, she heard two shots. The front door was open at the time and her mother was in the store. After hearing the two shots, she saw her uncle leaning up against one of the front windows to the store. His eyes were open and she and her mother went out the store to him. Her mother called his name and he did not answer. Someone walked up and said he had been shot. She called the ambulance and the Police Department. The police arrived after the ambulance got there and she rode in the ambulance to the hospital.

Mr. Charles C. Robey from the Jefferson County Coroner's Office went to the University Hospital and examined the body of Mr. Garland and found that he was dead. His qualifications were admitted and he testified:

"He had two gunshot wounds. The first wound I'll describe as entrance wound number 1. It was two and one fourth inches approximately to the left of the middle line of the body. Fifteen inches

down from the head. The second wound, wound number 2, was approximately three inches to the left of the middle of the body and approximately nineteen from the head. These wounds were in front of his body.

\* \* \* \* \* \*

"Bullet number 1 entered between the second and third rib angled down and to the right. It lodged between the eighth and nineth rib at the back of the body. It penetrated the lung. Bullet number 2 penetrated the liver. It entered the body between the seventh and eighth rib, went through the lobe of the liver, lodged to the left of the spine between the eleventh and twelfth rib at the back of the body."

He was asked his opinion as to the cause of death and replied, "Yes sir. The cause of death was multiple gunshot wounds to the chest."

The Coroner made photographs of the wounds on the body and they were admitted in evidence without objection. It was the Coroner's opinion that a small caliber weapon was used in shooting the deceased, and he was shot at close range as there was powder on his shirt.

On the night of the killing four black men met at the Bamboo Room at Frank's Motel and Lounge. They were Joe Ferguson, Jim Davis, James Merritt and appellant. Jim Davis had a blue Ford automobile. He told the other three men that he was going to find his girlfriend and asked them if they wanted to go with him. All four got into the car with Davis driving. Appellant was in the frontseat with Davis. Merritt and Ferguson were in the backseat. Davis drove to his girlfriend's house located about a block and a half from the A & A Delicatessen but he did not find her at home. They parked in an alley near the store and Davis and appellant got out of the car and said they were going to the store to buy some cigarettes. They were gone about five minues and when they re-turned to the car, Davis asked Ferguson to drive the car. On the way back to the Bamboo Room, Davis asked appellant why he shot the man and appellant said, "Ah ———— it." The other occupants of the car testified that appellant made that statement loud enough for everyone in the car to hear it.

In the course of the investigation of this homicide, James Davis was picked up and questioned about the events leading up to the shooting. He was given the *Miranda* rights and warnings. He gave a statement to the officers and testified for the state. He testified that he parked his car in an alley a short distance from the A & A Delicatessen and was fixing to go into the store; that appellant was in the vicinity of the store at the time; that he saw that appellant had a small caliber pistol. As he approached the store, he saw a short, heavy-set white man in the vicinity of the garbage can to the side of the store. He saw appellant and James Merritt close to the white man and heard two shots but he did not see who actually shot him. After the shots were fired, he turned around and ran back to his car. As they drove away he asked appellant, "What he shot the man for?", and appellant said, "———— it, you know. Let's go, you know."

From the record:

"Q. Thats what Carl Bass said? (sic)

"A. Yes sir.

"Q. Have you ever made a statement to police officers?

"A. No police officer.

"Q. I beg your pardon?

"A. No.

"Q. Sergeant Zales or Wallace?

"A. Detectives. But I haven't talked to no police.

"Q. The detectives, you talked to them?

"A. Yes.

"Q.  MR. PICKARD: Your Honor, with respect to one question and answer, I would like to claim surprise and ask him about a previous statement.

"THE COURT: You are surprised?

"MR. PICKARD: Yes.

"Q.  When you talked to Detective Wallace and Zales, I would like for you to read that last question and answer. Look at it. I'd like to ask you whether Sergeant Wallace or Zales asked you this or this in substance, 'You are telling me now that Carl Bass shot Mr. Garland?' And your answer was, 'Yes.'

"A.  Yes.

"MR. PICKARD: That's all the questions I have.

"THE COURT: Is that what you are saying?

"WITNESS: Yes.

"THE COURT: That Carl Bass shot him?

"WITNESS: Yes.

"MR. PICKARD: I do have one more question, Your Honor.

"Q.  When you got back to the Bamboo Room, how many of you got out of the car?

"A.  I don't remember going back to the Bamboo Room.

"Q.  Did you ever part company with Joe Ferguson and James Merritt?

"A.  Could you repeat that?

"Q.  When did you separate, You and Joe Ferguson and Jimmy Merritt?

"A.  I was with Joseph Ferguson.

"Q.  Where did Carl Bass go after you left there?

"A.  I don't know.

"Q.  Did you ever see the pistol after that?

"A.  No."

Davis further testified that as he was about to go into the store, he saw appellant and Merritt go over to Mr. Garland and start tussling with him but he did not see who fired the pistol. Until this time, however, appellant was the only one he saw with a pistol. He further testified that Ferguson was in plain view of the incident and that Ferguson told him that he was positive that appellant shot Mr. Garland.

A twelve-year-old boy, Sylvester Jones, testified that he was at the store that night and he saw a tall man holding the gun on Mr. Garland and he heard two or three shots. He was asked to look around the courtroom and "see if you see the man in this courtroom today who had the gun and shot Mr. Garland." The witness pointed toward the defendant.

Woodrow E. Talley, who was employed at Wells Shell Service Station, located on 26th Street and 34th Avenue, North, in Birmingham testified that on February 16, 1973, a black man came to this station and bought a battery, gas and oil, and also got a lube job. The total amount came to about $48.00. He presented a Shell Credit Card in payment of these purchases. The card bore the name of Herman Garland. Shell Oil Company has a policy that when a purchase is made in excess of $10.00, the transaction has to be cleared with the company's central office. Mr. Wells called the central office and was informed that the credit card could not be used for this purchase.

We quote from the record:

"Q.  Did you return this card to the person who was there?

"A.  I can't remember whether Mr. Wells took the card or not.

"Q.  Did you make a purchase on that card?

"A.  He tried to. He called the number in. You have to get a number from Shell Oil on anything over

$10.00. I think this came to about somewhere about $48.00.

"Q. Was it OK'd?

"A. No sir it wasn't.

"Q. What did you do with the card?

"A. I believe Mr. Wells held the card, I believe.

"Q. Do you see a person in the courtroom today that brought that card to the service station which bore the name of Herman Garland?

"A. Yes sir.

"Q. Would you point him out please?

"(MR. PICKARD) Let the record show that the witness pointed to and indicated the defendant, Carl Bass.

"Q. Did you and he have any conversation about the card after that?

"A. Well I walked out and told him that the card was no good. And he said well I don't understand why it ain't, and I said well it isn't. Then I told him we would have to have $48.00.

"Q. Are you talking about a conversation you were having with him?

"A. Yes sir.

"Q. Go ahead?

"A. So I told him we were gonna have to have $48.00 and he said he would have to call somebody, and he did. I don't know who. They were in a Skylark Buick, that's what they were driving when they brought the money up there.

"MR. PICKARD: I would like these two documents marked as 'State's Exhibit No. 6 and 7 for Identification please.' (sic)

"(Thereupon, the court reporter marked two documents as State's Exhibits No. 6 and 7 for Identification, respectively. The following proceedings were then had and done:)

"(Thereupon, Mr. Pickard handed the two exhibits to Mr. Falletta. The following proceedings were then had and done:)

"Q. I'd like to show you what's been marked for Identification as State's Exhibit No. 6.

"A. Yes sir, that's ours.

"Q. You're familiar with that item depicted in there?

"A. Yes sir.

"Q. What is that item?

"A. That's a guarantee on a battery sale. When you buy a battery you get a 36 month guarantee, and we had to give him a copy. We had to put the name down, what kind of car, and what have you. Then we give him his half and we kept the other half. Where it split right there.

"Q. I'd like to show you what has been marked as Identification as State's Exhbit No. 7. What is that?

"A. That's February 16, 1973, battery sold for type of car Ford.

"MR. FALLETTA: Your Honor I would like to object at this point to pictures being introduced into evidence and any questions introduced off those pictures, the best evidence in this case would be the actual book.

"MR. PICKARD: If you will give me a few minutes I'll have Sergeant Zales go up to my office and see if we can find this evidence.

"THE COURT: What do we do during the break?

"MR. PICKARD: I didn't know that we didn't have these and that we would need these.

"THE COURT: Well those pictures are objectionable. How long is this going to take?

"MR. PICKARD: My office is one floor up.

"THE COURT: Do you have any other questions of this witness?

"MR. PICKARD: Yes sir. But it would be in connection with that evidence.

"THE COURT: All right.

"(Thereupon, two items were handed to the court reporter and marked as State's Exhibits No. 8 and 9 for Identification, respectively. The following proceedings were then had and done:)

"Q. I'd like for you to examine what's been marked for Identification as State's Exhibit No. 8. Are you familiar with that?

"A. Yes sir.

"Q. What is that?

"A. That's where we gave a guarantee to the battery he bought.

"THE COURT: Is that it?

"WITNESS: Yes sir. That's the part we kept. We give him this.

"THE COURT: But is that it?

"WITNESS: Yes sir.

"Q. What name appears on that slip?

"A. Herman Garland.

"Q. After examining what's been marked for Identification as State's Exhibit No. 9 are you familiar with that piece of paper?

"A. Yes sir.

"Q. What is that?

"A. That's a Shell Credit Card. He give us a credit card to charge it

to. Let's see, he give us a Shell Credit Card that had Herman L. Garland on it. That's the one we called in on it. This is the credit card right.here.

"THE COURT: That this man right here gave you (indicating)?

"WITNESS: Yes sir.

"THE COURT: Or is this the ticket that you made up?

"WITNESS: No sir. This is the ticket we made up from his credit card. He's the one that had the card.

"Q. Who put the signature Herman Garland on there?

"A. He did (indicating).

"Q. Both of these papers were prepared and this one (indicating) was given to this man on what date?

"A. February 16, 1973."

Sergeant Richard Zales arrested appellant on April 20, 1973, and searched him for the victim's billfold and did not find it. He found appellant's billfold and in it was the customer's copy of the battery guarantee bearing the name of the deceased and dated February 16, 1973. The state proved that the original warranty was in the files of Wells Shell Oil Station. These were introduced in evidence.

After appellant was arrested he was carried to City Hall and given the *Miranda* rights. He refused to make a statement of any kind to the officers and offered no explanation as to why he was in possession of a battery warranty with the name of the deceased signed to it.

One Willie Karl testified in behalf of appellant. According to his testimony he was in the Bamboo Room of Frank's Motel with appellant in January, 1973, about a week and a half before February 1, 1973, when a man whose last name was Kimball, nickname Pluke, sold appellant a credit

card for $5.00; that the last name on the credit card was Garland. He was not certain as to the kind of credit card it was but he thought it was a Bank Americard. He said he was a good friend of appellant and did not know he was going to be called as a witness until he came to court that day on another matter.

Appellant testified in his behalf. He denied that he went with Ferguson, Merritt and Davis to the A & A Delicatessen the night Mr. Garland was killed. He admitted he purchased a credit card that had the name "Herman Leonard Garland" on it from John Kimball, also known as "Pluke". He bought it for $5.00 in January of 1973, and tried to use it and was told that it was no good. He tried to buy a battery at the Shell Service Station and they took the card and said they had to send it back to the company; that he had to call his wife to bring him $48.00 to pay for the battery and the other purchases.

He further testified that the service station people held his car keys until his wife brought the $48.00. He said he signed the warranty. He was shown the warranty introduced in evidence but said that was not the one he signed; that the warranty in evidence was dated February 16, 1973, and that the one he signed was dated January 16, 1973.

On cross-examination he testified that he had never been to the A & A Delicatessen and did not know where it was located. He denied owning a pistol and said he never owned one in his life. He admitted knowing Ferguson, Merritt and Davis, but was not with them on February 7, 1973. He said he could not remember where he was that night.

On rebuttal the state recalled Mrs. Garland and she testified that her husband had his Shell Credit Card in his possession on Sunday before he was killed the following Wednesday night.

The evidence for the state put appellant at the scene of the shooting and he was the only one of the four men present who had a pistol. After the shooting and as they were leaving the scene, Davis asked him why he shot the man and appellant replied, "Ah _____ it. Let's go." He was found in possession of the Shell Credit Card belonging to the deceased. He used it to buy a battery and other purchases but was foiled in his attempt to do so. A copy of the battery warranty bearing date of February 16, 1973, was found in his billfold when he was arrested. It is hard to imagine a stronger case of circumstantial evidence pointing to the guilt of appellant.

■ This is one of the strongest circumstantial evidence cases to find its way to this court in a long time. Circumstantial evidence is entitled to the same weight that direct evidence is entitled to provided that it points one way, viz., to the guilt of the accused. Where, as here, the prosecution relies to a great extent on circumstantial evidence for a conviction, very wide latitude is allowed in making proof. Willis v. State, 37 Ala.App. 185, 66 So.2d 753; Sumeral y. State, 39 Ala.App. 638, 106 So.2d 270; Cline v. State, 25 Ala.App. 433, 148 So. 172; Hollenquest v. State, Ala. App., 301 So.2d 264.

■ We are required to consider the evidence in the most favorable light for the prosecution. Womack v. State, 34 Ala. App. 487, 41 So.2d 429.

In Hill v. State, 26 Ala.App. 347, 159 So. 503, we find this expression:

"Anything said or done at the time of the alleged offense by [the] parties present is relevant and admissible in evidence on trial therefor."

■ The *corpus delicti* is a fact, proof of which may be shown by circumstantial evidence, and if there is a reasonable inference to prove its existence, the court should submit to the jury for consideration the question of the sufficiency and the weight of the evidence tending to support that inference. Hines v. State, 260 Ala. 668, 72 So.2d 296; Burleson v. State, 52 Ala.App. 399, 293 So.2d 317.

■ Where there is legal evidence from which the jury can by fair inference find the defendant guilty, this court has no right to disturb the verdict. Price v. State, Ala.App., 301 So.2d 230; Haggler v. State, 49 Ala.App. 259, 270 So.2d 690; Bolton v. State, 21 Ala.App. 373, 108 So. 631.

■ There was no motion to exclude the state's evidence; there was no motion for a new trial; there was no request for the affirmative charge; there were no exceptions reserved to the oral charge to the jury, and no adverse rulings on the admission of evidence. In this state of the record nothing is presented to this court to review. Eady v. State, 48 Ala.App. 726, 267 So.2d 516; Grant v. State, 46 Ala.App. 232, 239 So.2d 903; Robinson v. State, 46 Ala.App. 684, 248 So.2d 583.

The judgment of conviction is affirmed.

Affirmed.

All the Judges concur.