Appellant went to trial in the DeKalb County Court upon the original complaint charging him with the offense denounced by Title 14, Section 115 (1), Code of Alabama 1940. Specifically he was charged with willfully or wantonly destroying 46 head of cattle, the personal property of H.W. Thompson, of the value of $18,500.00. The above section charges a misdemeanor and provides that the punishment must be proportioned to the offense and shall be a fine of not more than $10,000.00 or a sentence to imprisonment in the County Jail or to hard labor for the County for not more than 12 months. Appellant demanded a jury trial. At arraignment, in the presence of retained counsel, appellant pleaded not guilty. The jury found appellant guilty as charged and assessed a fine of $10,000.00 against him. As additional punishment the trial court sentenced him to imprisonment in the County Jail for 12 months. At the time sentence was imposed, appellant gave notice of appeal.
The evidence adduced by the State is not contradicted. Appellant did not testify but offered evidence as to his good reputation and character.
Appellant and the complaining witness, Mr. H.W. Thompson, were neighbors and had been for a good many years. Both were engaged in raising cattle and tendencies of the State's evidence for the State disclosed that appellant and the complaining witness had been feuding for a number of years because a number of Mr. Thompson's cattle were found dead in one of his pastures and he suspected appellant was poisoning his cattle.
In March of 1975 Mr. Thompson fed his cattle from a haystack that was in one of his pastures and soon thereafter he noticed the cattle became sick and unsteady on their feet and they fell on the ground and *Page 430 
died. Mr. Thompson contacted the Sheriff of DeKalb County, a Mr. Morris Cousins of the Cattlemen's Association, and Dr. G.S. Killian, a veterinarian of Fort Payne, Alabama, all of whom came to the Thompson place and viewed the dead and dying cattle.
Dr. Killian testified that when he viewed the cattle, they were showing signs of intense pain in the abdominal cavity, walking humped up, kicking up at their stomachs with the back feet, getting up and lying down, and some rolling, and some down to the point where they couldn't rise, that they had a very weak, rapid heartbeat, and labored breathing. He further testified:
 "We watched one there; well, I checked it about, I would say probably five to ten minutes later, we came back to it; it was already dead. Another thing I noticed was profuse diarrhea on a good many of them. Of course, this one was dead, which died after I got to the farm, we did an autopsy on. The main thing we found was the change in color from normal color of the liver; it had darkened some; in the rumen, the lining of the rumen, which is the first stomach on the cow, gave the appearance of being boiled; the propella (sic) was turning loose, that is the lining was turning loose from the wall of the rumen."
Dr. Killian stated that he had practiced veterinarian medicine for 27 years and in that time he had performed many autopsies. He said he removed the liver and the contents of the rumen and put them in separate plastic bags and turned the bags over the the Sheriff to deliver to the Department of Toxicology in Huntsville.
He further testified that in his professional opinion the cow on which he performed the autopsy died from arsenic poisoning.
Martha Odom, a criminologist with the Department of Toxicology in Huntsville, testified that she examined a substance identified to her as being part of a liver, finding an arsenic content therein, and further testified that she examined a substance identified to her as hay, and found an arsenic content therein. She stated that she could not determine from the tests she made whether sufficient arsenic existed in the animal tissue to cause death, nor could she testify that the content of arsenic in the substance identified to her as hay was sufficient to cause death.
Appellant filed a motion to suppress any statements made by him that tended to incriminate him on the ground that he was not give the Miranda rights and warnings, and considerable testimony was taken on this motion. It developed that while appellant was arrested and carried to jail, the record does not reflect that he was interrogated by any law enforcement officers. On the contrary, the testimony shows that appellant expressed a desire to talk to Mr. Thompson and his two sons.
A Deputy Sheriff went to Mr. Thompson and told him that appellant wanted to see him. Mr. Thompson went to the Sheriff's Office to see appellant. Appellant was not in jail but in an office below the Sheriff's Office. When Mr. Thompson entered the office, he asked appellant, "Did you send for me?" Appellant said, "Yes, why can't we be friends?" Mr. Thompson said, "Well, from the time over at Mountain Home that you promised never to poison my cattle again, we shook hands; haven't I kept my end of the bargain? Have you kept your end?" Appellant replied, "No, I sure ain't, I don't know why I did it, but I did. I poisoned your cattle." That was all that was said at that time and Mr. Thompson walked out of the office.
Mr. Thompson went and got his two sons and returned somewhere around 9:00 or 9:30 that night and they all had a conversation with appellant. This conversation took place in the same office as the first conversation with Mr. Thompson and appellant. The Thompsons were not law enforcement officers and there were no law enforcement officers present at this meeting with appellant. Appellant's counsel objected to any conversation had at that time because appellant was in custody of the Sheriff. The Court overruled the objection and the testimony continued:
From the record: *Page 431 
 "A. Well, he said, we went in, spoke to him, and sat down, and asked him why he was poisoning our cattle.
"Q. Who asked him that?
"A. I did.
"Q. All right, sir.
 "A. And he said, `I don't know'; and he said, `I poisoned your cattle; y'all can go ahead and send me off'; but said, `Don't sue me and take my home away from my wife and kids.' And I said, `We don't want your home; all we want to do is get you for poisoning our cattle.'
"Q. Is that all that was said, Mr. Thompson?
"A. Well, no, we talked on a while.
"Q. Tell us whatever you can recall.
 "A. That may be hard for me to remember. He said, `I didn't mean to kill all your cattle,' said, `I just meant to kill three, or four, or five,' and said, `Jimmy,' said, `your cattle, I can get you them back, your three,' but said, `I can't give your daddy back his because I ain't got that many.' He said, `I will work by the year if y'all won't sue me and take my home away from my wife and kids; I will work for the year and pay you back everything above my living to pay y'all for those cattle I killed.'
 "Q. Did he say anything about the method he used or how he poisoned the cattle?
"MR. BEATY: We object to the leading.
"THE COURT: Overruled.
"MR. BEATY: He said he told you all he had said.
"THE COURT: Overruled.
"CONTINUATION BY MR. IGOU:
 "A. Yes, he said that some time ago he had stole five gallons of poison from Norman Waldom.
"Q. Did he tell you what he had done with it?
 "A. He said that was what he used to poison them over the years, to soak the corn in and what he poured on the haystack."
Over appellant's objections photographs showing a number of dead cattle and a haystack were introduced into evidence.
An agreement was drawn up with reference to the Thompsons not suing appellant and it was signed by appellant, Billy Thompson, H.W. Thompson and Jimmy Thompson. This agreement was introduced into evidence as Defendant's Exhibit No. 2, and State's Exhibit No. 3, and is as follows:
"March 21, 1975
 BILL ABLES SHERIFF DEKALB COUNTY FORT PAYNE, ALABAMA 35967
 "This is an agreement between H.W. Thompson and his two sons and Raymond Ellis. That there won't be any suit from these three persons against Raymond Ellis of any nature. Against his farm, his cattle, or anything that Mr. Ellis owns concerning the poisoning of H.W. Thompson's. Since Mr. Ellis agrees to give state evidence concerning the death of these cows.
 Deft. sign here /s/ Raymond Ellis
signature /s/ Billy Thompson
signature /s/ H.W. Thompson
signature /s/ Jimmy Thompson
witness /s/ Stanley Hollingmont
witness /s/ Anthony Jones
witness /s/ Dell Rucks"
Appellant signed a statement with reference to the poison he used to pour on the haystacks from which the cattle were fed. It was introduced as Defendant's Exhibit No. 1, and is as follows:
"March 22 12:03 PM
 "I Raymond Ellis got a quart of potato poison at Norman Waldrop's place about two years ago. I got it from a can in his potato house and put it in an orange juice bottle. At the time I got the poison, I did not know at that time what I would do with it. About two weeks ago I Raymond Ellis decided to take this jar of potato poison and pour it on a stack of Mr. Thompson's hay. After I poured the poison on the hay, I took the bottle and threw it in Town Creek. *Page 432 
 /s/ Raymond Ellis (witness) /s/ J. Morris Cousins (witness) /s/ Harold Bartlett"
Appellant raises two major contentions upon which this case should be reversed and remanded: (1) the statements of appellant were made while he was in the custody of the Sheriff and he was not give the Miranda rights, and (2) the corpus delicti was not proved.
It is clear to us that appellant's confession of his guilt to the Thompsons was for the express purpose of avoiding a civil suit for damages in which he could well lose his home and farm and thus deprive his wife and children of the property owned by him. His confessory statements were not made to any law enforcement officer while in custody but were made to the parties whose cattle he had willfully poisoned.
Miranda warnings have no application when confessions or admissions otherwise admissible are given to persons who are not officers of the law nor their agents. Truex v. State,282 Ala. 191, 210 So.2d 424; Bedingfield v. State, 47 Ala. App. 677,260 So.2d 408.
The evidence is not contradicted that appellant sent for Mr. Thompson so that he could discuss the cause of his arrest. By no stretch of the imagination can it be said that the Thompsons came to see appellant at the behest or the instigation of any law enforcement officer.
The corpus delicti is a fact, proof of which may be established by circumstantial evidence, and if there is a reasonable inference to prove its existence, the Court should submit to the jury for consideration the question of the sufficiency and the weight of the evidence tending to support that inference. Hines v. State, 260 Ala. 668, 72 So.2d 296;Burleson v. State, 52 Ala. App. 399, 293 So.2d 317; Bass v.State, 55 Ala. App. 88, 313 So.2d 208.
This Court is required to consider the evidence in the most favorable light for the prosecution. Womack v. State, 34 Ala. App. 487, 41 So.2d 429.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
TYSON, DeCARLO and BOOKOUT, JJ., concur.