375 So.2d 504 (1978)
Will Ed GIPSON
v.
STATE.
8 Div. 38.
Court of Criminal Appeals of Alabama.
October 3, 1978.
Rehearing Denied October 31, 1978.
*505 James M. Gaines and Jeff D. Smith of Smith, Gaines, Gaines & Sabatini, Huntsville, for appellant.
William J. Baxley, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State, appellee.
HARRIS, Presiding Judge.
Under an indictment charging murder in the first degree appellant was convicted of murder in the second degree and the jury fixed his punishment at forty years in the penitentiary. He was represented by counsel of his choice and at arraignment pleaded not guilty. After sentence was imposed, appellant gave notice of appeal and trial counsel represents him on this appeal.
All of the evidence presented in this case was adduced by the State. Appellant did not testify, nor did he offer any evidence in his behalf.
At the conclusion of the State's case appellant moved to exclude the State's evidence on three grounds, (1) that appellant had been granted immunity by the prosecution, (2) the State had failed to prove the corpus delicti, and (3) failed to prove the proper venue. The Court denied the motions.
The widow of the deceased, William Ed "Joe" Mefford, testified that her husband came home the morning of February 6, 1975, at 6 o'clock. He had been drinking during the night and he left again around 7:30 that same morning. She said that was the last time she saw him alive. She stated that he worked for the Coca Cola Company and had on green uniform pants and a white shirt which were furnished him by the company. He had dentures but he left them at home when he left in his truck. She said he had two scars on his right side which were surgical scars. Three days later she went to the County Jail and reported her husband was missing. After her husband's body was recovered from the back waters of the Tennessee River she attended his funeral. She further testified that she and her husband lived in Madison County.
*506 Earnest Joe Pence testified that on February 6, 1975 he was married to appellant's sister, Alva Jean Gipson. The night before he was with the deceased at the trailer home of Bernice Humphrey. The three men started shooting dice and Pence and the deceased won the money. The game broke up about 2 o'clock the next morning. Pence further testified that three or four weeks prior to February 6, 1975, he gave his wife a .22 caliber Harrington & Richardson pistol. During the trial he was shown a disassembled pistol and stated that it appeared similar to the one he had given his wife. He further testified that he did not give appellant authority to possess that weapon and did not know when or how he came into possession of the pistol. Pence stated the deceased came to his house the next morning in his pickup truck and they drove to a shopping center where the deceased bought a half gallon of Ancient Age whiskey. The deceased took Pence to his home about 2:30 that afternoon and that was the last time he saw the deceased. Pence was shown a photograph of a pickup truck and identified it as being similar to the one driven by the deceased on February 6, 1975. He said he had known appellant about a week and he was driving a black 1959 Buick automobile. The Buick had a tag on it and Pence thought it was an out of state tag but he did not know the number. Pence was shown a photograph of the Buick and identified it as similar to the car that appellant was driving on the occasion in question.
Pence further testified that the pickup truck driven by the deceased was a Chevrolet and was a 1974 or 1975 model. He described the color as being orange and white or red and white. He stated that he and the deceased drank some of the whiskey purchased by the deceased from a State store on February 6, 1975.
Bernice Humphrey testified that he shot dice with Pence and the deceased on the night of February 5, 1975. Humphrey lost about a hundred and fifty dollars and had to borrow twenty-five dollars more from the deceased to stay in the game. Humphrey pledged a tape recorder for this loan. The game, Humphrey further testified, broke up at 3 o'clock a. m. Humphrey testified that he later saw the deceased at the funeral home. A body which was unrecognizable was identified to the witness as being that of Joe Mefford.
Richard Young testified that he saw the deceased on February 6, 1975 at Meeks Grocery. Young filled the deceased's truck with gas. A 1959 or 1960 black Buick was parked at the store at that time. Young saw the deceased talking to the occupants of the Buick.
Will Ed Jones testified that on February 6, 1975 he lived at the Honeycomb Trailer Park in Marshall County, Alabama. When Jones returned to his home from a trip to Guntersville that day, appellant, his wife, and the deceased were there. Appellant had a bottle of whiskey which contained a white powder. Appellant shook the bottle and told Jones not to drink any of it. At this time the deceased and appellant's wife were inside Jones's trailer. Appellant told Jones that the deceased had between a hundred and fifty and two hundred dollars. Shortly after this occurred, appellant, his wife, and the deceased all left together in appellant's car, a black 1960 Buick.
Jones further testified that appellant and his wife returned after midnight. Appellant told Jones he wanted to show him something and raised the trunk lid of his car. Jones saw a man's body in the trunk, but could not tell who it was. When Jones turned to go inside the trailer, appellant grabbed his arm and told him that he "was going with him." Appellant had a gun. A pickup truck was also parked by Jones's trailer. Appellant told Jones that the body in the trunk was Joe Mefford. Appellant put Mefford's body in the cab of the pickup truck and told Jones to drive. During the subsequent ride, appellant told Jones that he "wasted" Mefford and that he would not have had to "waste" him if Mefford had passed out. Jones testified that they rode down to the boat docks off Hobbs Island Road in Madison County. Appellant dumped Mefford's body in the river. Appellant *507 had removed some of the victim's clothing during the trip to the docks. These clothes were burned by appellant and his wife at Guntersville Dam. Afterwards, this trio drove to Jasper, Alabama. There, in Jasper, they went to Walter Jent's, where the pickup truck and two guns were left. Subsequently, the truck and guns were sold. Jones further testified that he and appellant were first cousins.
Sheila Cross testified that on the night of February 6, 1975, she was with her boyfriend at the trailer of Will Ed Jones. About midnight, appellant and his wife came to the trailer and talked "about some guns." Appellant and his wife showed everyone two pistols, one larger than the other. After this, appellant and his wife left, taking Will Ed Jones with them. Appellant said they were going down to the gravel pit to shoot dice. Kenneth Jackson testified that he was with Sheila Cross at the trailer of Will Ed Jones on the evening of February 6, 1975. Jackson testified to substantially the same events as had Miss Cross.
Royce A. Spry testified that he was a funeral director and the Coroner for Lauderdale County. On March 20, 1975, Spry received a telephone call from two fishermen who had discovered a body in the back waters of Wilson dam, east of Florence, Alabama. Upon receiving this call, Spry went to that location, where he removed a body from the water. The body was then transported to Spry's Funeral Home in Sheffield, Alabama. Spry also testified that he observed a small wound on the right side of the deceased's forehead. Later, Spry was present at an autopsy when a bullet was removed from the head of the deceased.
Bill Butler testified that he was employed by Saint's Floor Service and that he had worked with the deceased. On March 21 or 22, 1975, Butler viewed a body at the New Hope Funeral Home in Madison County. He identified that body as that of Mefford, and observed what resembled a bullet hole in the body's forehead.
Edward Myhand testified that he was a Lieutenant in charge of the intelligence unit of the Madison County Sheriff's Office. On March 20 or 21, 1975, Myhand went to Sheffield, Alabama, to attempt to identify a body found in the Shoals Creek area. My-hand took several photographs of the deceased.
Joe Filyan testified that he was Assistant Chief of Police in Jasper, Alabama. On April 22, 1975, Filyan received certain information which led to his recovery of a pickup truck at the home of Newman Daniels. A check of the VIN number revealed that "the truck was involved in a murder case in Madison County." Subsequently, Filyan spoke to Walter Jent, Ray Jones, and Newman Daniels. Still later, Filyan recovered a .32 caliber pistol and a .22 caliber pistol at Ray Jones's grocery store. These were given to Investigator Whittle of the Madison County Sheriff's Department.
Walter Jent testified that appellant came to his house on February 6 or 7, 1975. Appellant's wife and Will Ed Jones were with appellant. Appellant wanted Jent to dispose of a pickup truck which he had brought to Jent's house. Jent subsequently sold the truck to Ray Jones for six hundred dollars; he gave appellant "some small amount of the money" and may have given some to Jones. The truck was driven to the home of Newman Daniels. Jent also testified that appellant had a black 1960 Buick automobile. Appellant and Jones showed Jent two pistols which were in the Buick. Some conversation was had about the weapons, but Jent could not remember what was said and he gave the guns to Ray Jones. Jent further identified photographs of pistols as being similar in description to the weapons shown him by appellant.
James Whittle testified that between February and April, 1975, he was an investigator for the Madison County Sheriff's Office. The VIN number on the pickup truck, recovered in Jasper, Whittle testified, was the same as the VIN number of Mefford's truck registered in the tag registration office in Madison County. Whittle also recovered at Ray Jones's grocery store two pistols: one H & R, model 923, .22 caliber, nine shot revolver with a six inch barrel; *508 and one .32 caliber pistol, Rossi, with a three inch barrel and pearl plastic grips. These weapons were subsequently carried to the toxicologist's office in Madison County.
A stipulation by counsel was read to the jury. From the record:
"THE COURT: As I understand what you are proffering under your stipulation is that if Emmet Sanders, the license commissioner of Madison County, were to testify in his case that he would testify that his records reveal a registration of a truck bearing the same vehicle identification number as that which is the subject of plaintiff's exhibit 16, and that registration was issued to one, William Ed Mefford, or Joe Mefford.
"MR. SMITH: I don't know whether it was issued to Joe Mefford or whether it was issued to Mrs. Mefford or who it was issued to.
"THE COURT: Off the record for just a moment please.
(Thereupon ensued an off the record discussion, following which the following proceedings were then had and done:)
"THE COURT: Okay, are you willing to stipulate that that tag was issued to one, Will Ed Mefford?
"MR. SMITH: On the date that the issuance was made, yes, sir."
Van Pruitt testified that he was a toxicologist for the Department of Toxicology and Criminal Investigation, State of Alabama. On March 21, 1975, Pruitt performed an autopsy on a body, identified to him as that of Will Ed "Joe" Mefford. During this procedure, Pruitt recovered from within the head a small caliber lead projectile. Pruitt gave this projectile to Brent Wheeler, a criminalist in the Department. Pruitt formed the opinion that the cause of death was cerebral trauma associated with a gunshot wound to the head.
Brent Wheeler testified that he performed ballistics tests on a H & R, .22 caliber revolver, submitted to the office by James Whittle. Test projectiles fired from this weapon were similar in general characteristics to the projectile removed from the body of Mefford. However, that projectile was so mutilated that a positive identification of the projectile's source weapon could not be made, other than it was approximately a .22 caliber.
Jim Stewart testified that he was an investigator for the Madison County Sheriff's Department. On March 24, 1977, Stewart received a telephone call from a person who identified himself as appellant. From the record:
"Q. This individual on the other line would you relate to the court, what if anything that individual said?
"A. Well, I was called to the phone and after saying hello, he said this is Bill, and I said Bill who, and he said Bill Gipson. I had been trying to contact him and I think the first thing he told me was, `I didn't kill that guy'something similar to thisHe said, `But I was paid four to six hundred dollars and I can't remember which, to get rid of the truck,' and I asked him who paid him and he said something similar to `You know who I am talking about.'
"Q. All right, he said that someone had paid approximately four to five hundred dollars to get rid of the truck and body, is that correct?
"A. He said four to six.
"Q. This individual that was on the other line did they identify to you who they were to get rid of, which body?
"A. Mefford."
Will Ed Jones was then recalled by the State. Jones testified that appellant pointed out a spot in front of the Riverside Beverage Store as being the place where he shot Mefford. Jones further testified that this spot was in Madison County.
On April 6, 1977, the following agreement was given by Roy Miller, an assistant district attorney for Madison County, and Jim Stewart, an investigator for the Madison County Sheriff's Department, to appellant.
"TO: William Gipson
"DATE OF BIRTH: November 4, 1933
"SOCIAL SECURITY NUMBER: XXX-XX-XXXX
*509 "Re: Murder of Joe Mefford
"We are hereby granting you immunity from prosecution for any offense which you have committed with regard to the circumstances surrounding the murder of one Joe Mefford of New Hope, Alabama in February, 1975. This immunity includes but is not limited to, any firearms, the disposition of any automobiles or trucks, flight to avoid arrest or prosecution, and accessory after the fact to the murder of Joe Mefford. This immunity is transactional immunity and not use immunity. We represent to you, William Gipson, that we are authorized law enforcement officers of Madison County and the State of Alabama and have the authority to offer this grant of immunity to you.
"Signed:
___________________________
ROY MILLER
Assistant District Attorney
Madison County
__________________________
JIM STEWART
Investigator
Madison County Sheriff's Department
Huntsville, Alabama"
The facts giving rise to this agreement and the events that followed are found in the transcript of evidence taken on a hearing of a petition for Habeas Corpus, filed by appellant on May 25, 1977, after his indictment for the murder of Will Ed "Joe" Mefford.
Roy Miller testified that he was an Assistant District Attorney in Madison County and that he participated in the investigation of Will Ed "Joe" Mefford's death. On April 6, 1977, Miller went to Niles, Michigan, where he talked with appellant. He had no warrant for appellant's arrest. At that time Miller signed and presented to appellant the agreement shown above.
Miller was not familiar with this case. On the trip to Michigan, Jim Stewart, an investigator for the Madison County Sheriff's Department, informed him that this murder case had been pending about two years. Stewart had located a witness to whom he wished to give immunity in return for information about the case. Stewart also told Miller that this witness was not a suspect in the actual killing of Mefford.
Although it was not included in the written agreement, Miller testified that he informed appellant in the presence of his attorney in Michigan that any immunity was conditioned upon his telling the truth. There was also an understanding that appellant would testify against Will Ed Jones before the grand jury and take a Polygraph test.
Appellant did return to Alabama. Miller testified that while he was presenting evidence to the grand jury on this case, Stewart advised him that appellant had taken the Polygraph test and that the results showed appellant had lied "at every material point." In Michigan, appellant told Miller and Stewart that he had only disposed of Mefford's body. Subsequent to the Polygraph test, appellant admitted shooting Mefford, but claimed it was an accident. Will Ed Jones testified before the grand jury and gave details which corroborated appellant's subsequent statement. Miller further testified that if appellant's attorney in Michigan were present he would testify that the agreement did not preclude appellant's prosecution if he did not tell the truth.
Jim Stewart testified to substantially the same events.
At this time, the trial court denied the petition, stating that no law of Alabama authorized a district attorney to "bind the grand jury from prosecuting and indicting and causing prosecution of any defendant..."
Subsequently, appellant filed a plea in abatement stating the immunity agreement as the ground for the motion. Appellant also alleged the agreement as a ground for a new trial. These motions were denied.
Appellant contends here that the trial court erred in failing to discharge him, arguing that the agreement of April 6, 1977, was a bar to his prosecution. We do not agree.
*510 As appellant points out, this issue involves the validity of a non-statutory immunity agreement. This question presents two issues for consideration: (1) the authority of a district attorney to grant immunity from prosecution, and (2) the enforceability of the non-statutory agreement subsequent to the witness's giving incriminating testimony. Comment, Judicial Supervision of Non-Statutory Immunity. 65 Journal of Criminal Law and Criminology, page 334, et seq.
It is appellant's position that the first issue of the district attorney's authority to grant immunity has no bearing on the issue of enforceability. He adopts a theory that the State should be estopped from disavowing the agreement because of his reliance on Miller's representation of authority.
Judicial authority on the validity of non-statutory immunity agreements is apparently divided into two diametrically opposed camps. One position is that such an agreement is unenforceable because of the district attorney's lack of power to enter into such an agreement.
The idea that the district attorney may not bargain away the State's right to prosecute is illustrated in Bowie v. State, 14 Md.App. 567, 287 A.2d 782 (1972). There, the Court stated that only the legislature could confer the authority to grant immunity from prosecution. To recognize the validity of an agreement such as this would allow the district attorney to distort the legislature's intent to proscribe certain behavior as criminal. Thus, the Appellate Court concluded that a non-statutory immunity agreement will not bar a defendant from prosecution, even though the defendant in such a case has only an equitable claim which may be supported by a recommendation for executive clemency. For a general overview on the question of a district attorney's authority to grant immunity, see Annot., 13 A.L.R.2d 1439 (1950).
Other jurisdictions hold that such agreements are enforceable, though the district attorney has exceeded his statutory authority by granting a defendant immunity. Of course, a prerequisite of the agreement's enforcement is that the defendant perform his part of the bargain. Grounds for the enforceability of such agreements include the following: public policy demands that the honor of the state be upheld, People v. Bogolowski, 326 Ill. 253, 157 N.E. 181 (1926); the contractual doctrine of consideration, State v. Hingle, 242 La. 844, 139 So.2d 205 (1962); State v. Ashby, 81 N.J.Super. 350, 195 A.2d 635 (1963); contractual estoppel, People v. Brunner, 32 Cal.App.3d 908, 108 Cal.Rptr. 501 (1973).
In Alabama, non-statutory immunity agreements have seldom been the subject of appellate review. This is, most probably, because the legislature has specifically set out those instances in which immunity may be conferred upon a potential defendant. Some of those situations are listed below: Witnesses appearing before the grand jury concerning liquor violations, Code of Alabama (1975), Section 28-4-318; witnesses appearing before the grand jury concerning gaming and lottery cases, Code of Alabama (1975), Section 13-7-29; and Code of Alabama (1975), Section 12-21-223, which allows the trial court to nol pros a case against a co-defendant upon motion of the district attorney, in order that the co-defendant may be a witness for the State. A complete listing is found in 8 Wigmore on Evidence, Sec. 2281, n. 11 (McNaughton rev. 1961).
Alabama courts have never held a nonstatutory immunity agreement to be binding upon the State. In Long v. State, 86 Ala. 36, 5 So. 443 (1889), we find the following language:
"... When an accomplice is examined as a witness by the prosecutor, and fully and fairly discloses the guilt of himself and associate, there is an implied promise, as generally regarded, that he will not be prosecuted for the same offense. In such case, the prosecuting officer may decline to institute proceedings against him, or may discontinue them if already commenced. If this course is not pursued, the practice is to put the defendant on trial, and, if convicted, to recommend him to executive clemency. His *511 right not to be prosecuted, or to a pardon, is equitable only, based on the pledged faith of the public. He cannot plead the facts in bar of an indictment, nor avail himself of them by motion to dismiss the prosecution." (Citations omitted).
Whether or not the defendant receives a recommendation for executive clemency is in the discretion of the district attorney and the trial court. Odiorne v. State, 249 Ala. 375, 31 So.2d 132 (1947).
We note here that the actions of appellant certainly do not merit clemency. Appellant admitted killing Mefford, though he claimed it was an accident, when confronted with the results of the Polygraph. In a case similar on the facts, Burt v. State, 20 Ala.App. 296, 101 So. 768, certiorari denied, Ex parte Burt, 212 Ala. 96, 101 So. 770, defendant asked that he be permitted to testify before the grand jury and to testify against another individual, concerning a liquor violation. Subsequently it developed that the defendant employed the man, against whom he had testified, for the purpose of transporting liquor that he, himself, distilled. The Court of Appeals held that the defendant could not avail himself of the immunity offered by statute, since he had gained admission to the grand jury room by subterfuge and was, himself, the primary offender. Thus were we to adopt a "contract" theory of the case concerning the immunity agreement, the result would be the same for "failure of consideration." The agreement would not serve as a bar to the prosecution.
To accept the validity of a non-statutory immunity agreement would be to accept the great risk that the principal offender could easily immunize himself against prosecution, through the ignorance of the district attorney, by testifying against an accomplice or even an innocent man. Such a risk is against the public interest that behavior made criminal by the legislature be properly punished. Thus, the approach in Bowie, supra, is sound and should be followed.
Section 15-8-130, Code 1975, provides:
"An indictment must not be quashed, dismissed, discontinued or abandoned without the permission of the court, and such permission must be entered of record."
The district attorneys are utterly without authority and power to grant an accused immunity from arrest and prosecution for violating our criminal laws. To clothe them with such power and authority would strike at the very heart of our system of criminal justice and oust the courts of the powers vested in them by the Constitution and statutes. This is not to be taken to mean that prosecuting attorneys and judges are forbidden to grant an accused immunity from prosecution for criminal offenses in exchange for truthful testimony as a State witness against others accused of crimes, or to testify against a co-indictee. Such immunity must never create an opportunity for a witness to effect an illusory exchange of real immunity in return for false testimony.
The State offered to prove the appellant's statement. Appellant objected to the admission of this statement into evidence. The Court sustained the objection, saying:
"Okay, taking the Court's previous understanding of the statement in the habeas corpus proceeding and in taking judicial notice of that in regard to the plea in abatement I sustain the objection and suppress the confession and will not allow the written statement in."
Appellant contends that the only testimony concerning venue in this case is that of Will Ed Jones, who testified that Mefford's body was disposed of in Madison County. As appellant points out, a conviction may not be sustained where venue of the crime is not established. Shores v. State, 25 Ala. App. 351, 146 So. 537 (1933).
The following occurred during the examination of Will Ed Jones. From the record:
"Q. Will Ed, you have testified earlier that you went with the defendant to where the body was disposed of, is that correct?
"A. Yeah.
"Q. And I believe you testified it was disposed of at the boat landing, is that in Madison County?
*512 "A. Yes, sir.
"Q. On your way there did the defendant or did he not point out where he had shot the deceased?
"MR. SMITH: Now we object to that.
"THE COURT: Well I sustain. I will allow him to say whether or not he made any statement to him and if so what the statements were.
"Q. As you approach the boat dock there, the landing, did the defendant make any statements to you?
"A. He pointed out before
"MR. SMITH: Now wait a minute, we object.
"MR. GAINES: He's talking about point Judge, we object as not responsive.
"THE COURT: Well I overrule.
"MR. SMITH: We except.
"THE COURT: You may answer.
"A. He pointed in front of the Riverside Beverage there.
"Q. All right, what is the name of that beverage store?
"A. Riverside Beverage.
"Q. And is there in fact a gravel flat area there?
"A. Yes.
"Q. Where he pointed is that in Madison County?
"A. Yes, sir.
"MR. MILLER: No other questions of this witness, well wait a minute
"Q. That is where he said that he had shot the deceased?
"MR. SMITH: Now we object to that may it please the court.
"THE COURT: Mr. Jones, did he make any statement to you as he pointed?
"A. Yes, sir. Right over there.
"Q. Did you ask him a question there?
"A. I asked him before we got there where it happened at or something and he said on the river and he
"MR. SMITH: Now we object to that may it please the court.
"A. Over there in front of the beverage, Riverside Beverage Store.
"MR. MILLER: And that is in Madison County?
"A. Madison County.
"MR. MILLER: We have no other questions of this witness."
Venue may be proved by circumstantial evidence as well as direct evidence. Wall v. State, 49 Ala.App. 285, 270 So.2d 831; Daly v. State, 47 Ala.App. 681, 260 So.2d 412, certiorari denied 288 Ala. 736, 260 So.2d 418, certiorari denied 409 U.S. 874, 93 S.Ct. 123, 34 L.Ed.2d 127. Jones testified that Mefford's body was disposed of in Madison County and that appellant pointed to a spot located in Madison County, when Jones asked where "it" happened. The jury could legally infer that the homicide occurred in Madison County. When the State offers evidence tending to show that the crime was committed within the jurisdiction of the Court, the question becomes one for the jury. Willcutt v. State, 284 Ala. 547, 226 So.2d 328.
During closing argument appellant's counsel made the following statement:
"I am going to talk about just a couple more things. First of all, the defendant's failure to testify in this case. I want to talk about that. I want to mention it to you."
The prosecutor pointed out to the Court that appellant's counsel was commenting on his client's failure to testify and stated that he wished to respond in kind. The Court ruled that he would hear what appellant's counsel had to say.
Appellant's counsel continued his argument in which he stated that appellant did not testify and that he had asked the jury on voir dire if they would consider that to be evidence against him and that the jury responded by saying they would not consider that as being evidence against him. Counsel continued by saying they sat down and talked to appellant and discussed the possibility of his testifying.
The Court instructed appellant's counsel to leave that area and go to something else.
During the State's closing argument the following occurred:

*513 "MR. MILLER: You are good citizens, tax payers and you have got good common sense or you wouldn't be on there and you are probably more highly educated on that jury than other juries in the State of Alabama, but while you owe a duty to this defendant to protect his rights and he certainly doesn't have to take the stand but they certainly are under a duty to produce
"MR. GAINES: Judge, we object at this time to any reference of the defendant not taking the stand.
"THE COURT: Mr. Miller do not mention it again.
"MR. GAINES: And we would like to ask that that be excluded from the jury's consideration.
"THE COURT: I will instruct the jury at the appropriate time concerning the law particularly in that area of the case and neither party will mention it again in the course of these proceedings.
"MR. GAINES: And we respectfully request a mistrial at this time, Your Honor.
"THE COURT: Motion denied."
Subsequently, the trial court included the following instruction in his oral charge to the jury:
"Ladies and Gentlemen, this defendant has not taken the stand and testified in this case and that is his perfect right. You are instructed in regard to that that is a fact from which you may draw absolutely no inference. It is not to be considered by you as a fact in the defendant's favor nor is it to be considered by you as a fact to be laid to the defendant's detriment. You may not draw conclusions of any sort from the defendant's failure to testify and if any comment has been made which has indicated to you that something should be drawn from the defendant's failure to testify either for or against him, then you are enjoined to disregard such statement. No inference whatsoever can be drawn from the defendant's failure to take the stand and testify in this case."
It is to be noted that appellant's own counsel injected into the trial that appellant did not testify. The district attorney's remarks could well be considered as argument in kind and were harmless.
Appellant requested the following written charges, which were refused by the trial court:
"DEFENDANT'S REQUESTED CHARGE NO. 28
"The Court charges the Jury that proof of contradictory statements or declarations on a material point made by the witness, Will Ed Jones, may be sufficient to raise a reasonable doubt in the minds of the Jury as to the truth of the testimony of the witness, Will Ed Jones.
"DEFENDANT'S REQUESTED CHARGE NO. 29
"The Court charges you, Ladies and Gentlemen of the Jury, that if the guilt of the Defendant depends upon the testimony of the State's witness, Will Ed Jones, and you have a reasonable doubt as to the truthfulness of his testimony, then you should find the Defendant not guilty.
"DEFENDANT'S REQUESTED CHARGE NO. 30
"The Court charges you, Ladies and Gentlemen of the Jury, that if you believe from the evidence in this case that the witness, Will Ed Jones, has willfully and corruptly sworn falsely as to any material fact in this case, you may in your discretion disregard his testimony entirely.
* * * * * *
"DEFENDANT'S REQUESTED CHARGE NO. 32
"I charge you, Ladies and Gentlemen of the Jury, that if you do not believe the evidence of the witness, Will Ed Jones, the Defendant cannot be convicted.
"DEFENDANT'S REQUESTED CHARGE NO. 33
"The Court charges you, Ladies and Gentlemen of the Jury, that if you do not believe the testimony of the witness, Will Ed Jones, and if you find there is not other evidence in the case connecting or implicating the Defendant with the crime charged, then he cannot be convicted.
* * * * * *

*514 "DEFENDANT'S REQUESTED CHARGE NO. 35
"The Court charges the Jury that, in considering the truthfulness of the testimony of Will Ed Jones, that the Jury, in passing upon his credibility, may consider the fact that he is charged by indictment of the killing of Joe Mefford.
"DEFENDANT'S REQUESTED CHARGE NO. 36
"Ladies and Gentlemen of the Jury, I charge you that if the evidence convinces you that Will Ed Jones is a man of bad character and unworthy of belief, then you may disregard his testimony altogether."
The trial court included in its oral charge to the jury the following instructions.
". . . If the evidence of the State consists of statements of witnesses or witness, the truth of which the jury has reason to doubt, they cannot convict the defendant on such testimony. A mere contradiction, Ladies and Gentlemen, standing alone would not in and of itself authorize you to disregard the testimony completely; on the other hand, if you find that a witness has testified willfully and intentionally in a false way to a material fact, then as to that witness you may disregard his or her entire testimony if you see fit. You do not have to do so but you may in your discretion do so. As I have said, if the evidence of the State consists of statements of witnesses or witness the truth of which the jury has a reasonable doubt, you cannot convict on such testimony. You are not authorized to find a verdict of guilty on the testimony of a single witness if you have a reasonable doubt as to the truth of his or her statement."
Where charges requested by the defendant are substantially covered by the court's oral charge the trial court commits no error in refusing the written requested charges. Alabama Digest, Criminal Law.
Where there is legal evidence from which the jury can by fair inference find the defendant guilty, the Court of Criminal Appeals has no right to disturb the verdict. Bass v. State, 55 Ala.App. 88, 313 So.2d 208; Washington v. State, 55 Ala.App. 116, 313 So.2d 544.
A careful search of the record reflects no error injuriously affecting the substantial rights of appellant. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.
TYSON, J., concurs with opinion.
TYSON, Judge, concurring.
I concur in the foregoing opinion as prepared by our Presiding Judge.
I am further of the opinion that the ruling of the trial judge and the instructions given the jury in his oral charge, concerning the district attorney's comment, rendered such matter harmless beyond a reasonable doubt in line with this Court's opinion in Adair v. State, 51 Ala.App. 651, 288 So.2d 187.
The instructions given by the trial judge thus removed any prejudicial effect that such statement may have had. Retowsky v. State, Ala.Cr.App., 333 So.2d 193; Napier v. State, Ala.Cr.App., 337 So.2d 62; Ellenburg v. State, Ala.Cr.App., 353 So.2d 810; and Earley v. State, Ala.Cr.App., 358 So.2d 494, cert. denied, Ala., 358 So.2d 501.