401 So.2d 191 (1981)
Kevin Udoka NOBIS
v.
STATE.
8 Div. 398.
Court of Criminal Appeals of Alabama.
March 31, 1981.
Rehearing Denied May 5, 1981.
*192 Jerrilee P. Sutherlin of Harrison, Burwell, Smith & Sutherlin and Dan Moran, Huntsville, for appellant.
Charles A. Graddick, Atty. Gen., and Mark R. Ulmer, Asst. Atty. Gen., for appellee.
HARRIS, Presiding Judge.
Appellant was indicted for the unlawful killing of Theroda Anakwe by stabbing her with a knife. Appellant was properly arraigned in the presence of counsel and interposed a plea of not guilty and not guilty by reason of insanity. Appellant was convicted of second degree murder and the jury fixed his punishment at sixty years in the State penitentiary. After sentence was imposed and his motion for a new trial denied, appellant gave notice of appeal. Appellant has been furnished a free transcript, *193 and both attorneys who were appointed to represent him at trial were also appointed to represent him on appeal.
A threshold question to this appeal is whether appellant, as a matter of law, was entitled to a preliminary hearing within thirty days of his arrest, upon making a demand for one thirteen days following said arrest, where he was indicted by a grand jury thirty-three days following his arrest.
A review of the proceedings pertinent to appellant's demand for a preliminary hearing reveals the following. Appellant was arrested on October 13, 1979 and charged with first degree murder. On October 26, appellant was provided two court-appointed lawyers to represent him who, on that date, demanded a preliminary hearing. A preliminary hearing was set for November 21. On November 2, appellant filed a motion to change the date of the preliminary hearing, requesting that, pursuant to Alabama Code § 15-11-1 (1975), the preliminary hearing be held within thirty days of appellant's arrest; it was anticipated in this motion that the Madison County Grand Jury would meet on November 13 and that if that body indicted appellant he could lose his right to a preliminary hearing; District Judge Dan W. McCoy denied this motion the day it was filed.
On November 5, appellant filed a petition for writ of mandamus in Circuit Court praying that he be given a preliminary hearing within thirty days of his arrest. Judge McCoy and appellant's lawyers worked together to frame a stipulation of facts and a statement of their respective positions regarding the interpretation of Alabama Code § 15-11-1 (1975), which were filed on November 8, to be considered with appellant's petition for writ of mandamus. The positions taken by appellant and Judge McCoy concerning Section 15-11-1 appear in the record as follows:
"1. The position of the petitioner (appellant) is that he has an absolute right to a preliminary hearing upon demand prior to indictment and within 30 days of his arrest.
"2. The position of the Honorable Judge Dan McCoy is that the petitioner's right to preliminary hearing exists prior to indictment and within 30 days after his demand for preliminary hearing.
"The point of law sought to be clarified is whether the 30 day time frame referred to in the statute runs from the date of arrest or the date of demand."
On November 8, Circuit Judge S. A. Watson, Jr., found that appellant had a right to a preliminary hearing within thirty days of his arrest and granted appellant's petition for writ of mandamus. Judge Watson ordered by Decree that a preliminary hearing be set prior to or on November 15.[1] On November 9, a preliminary hearing was scheduled for 10:00 a. m., Tuesday, November 13.[2]
The morning of November 13, the District Attorney filed a motion to set aside Judge Watson's Decree ordering the preliminary hearing and requested a rehearing on the petition for writ of mandamus. The District Attorney in this motion also requested Judge Watson to enter an order staying all proceedings in the District Court (the preliminary hearing). That same morning Judge Watson ordered his November 8 Decree stayed, and ordered a hearing on the petition for writ of mandamus be held at 2 o'clock that afternoon. All proceedings in the District Court were also ordered stayed. Later still, on the morning of November 13, appellant filed, in Circuit Court, a motion to set aside the stay of the District Court proceedings. This particular motion was not ruled upon.
*194 At 2:00 p. m. on November 13, Judge Watson conducted a hearing on appellant's petition for writ of mandamus. At that time he entertained testimony and argument concerning the proper construction of Alabama Code § 15-11-1 (1975). Judge Watson then concluded, in his November 14 order, that there was an "ambiguity" in Section 15-11-1, and that, based on the persuasive authority of section 5.1 of the proposed rules of criminal procedure, together with the evidence and argument, "the ambiguity in Section 15-11-1 should be resolved in favor of the State's position." Appellant's petition for writ of mandamus for the District Court to provide a preliminary hearing was denied.
The Madison County Grand Jury returned an indictment against appellant charging first degree murder on November 15. At no time was appellant ever provided a preliminary hearing.
Alabama Code § 15-11-1 (1975), (Acts of Alabama 1975, No. 1205, § 4-106(f)), the construction of which provides a resolution to this issue, reads as follows:
"Every person charged with and arrested for a felony before his indictment shall have an absolute right to a preliminary hearing on said charge upon such person's demand within 30 days following said arrest; provided, that such person's failure or refusal to appear for such preliminary hearing on his absence from the state at the time of the setting for the preliminary hearing shall not delay or invalidate an indictment pursuant to said charge."
The question which we must resolve is what period of time does the "30 days" specified in Section 15-11-1 pertain.
Dr. John Conover, an assistant professor of English at the University of Alabama in Huntsville, provided a scholarly explanation as to what the "30 days" referred at the November 13 hearing on appellant's petition for writ of mandamus; in essence he explained that the "30 days" could be construed to mean that a person's demand for a preliminary hearing must be made within thirty days of his arrest, or, on the other hand, it could be construed to mean that a person has an absolute right to a preliminary hearing within thirty days of his arrest, as long as a demand is made within that time. Appellant contends that the latter construction is proper while the State argues in favor of the first construction. Our duty is to determine which of these two interpretations must prevail. We do not find the construction adopted by Judge McCoy to be a reasonable interpretation.
In other words, from a plain reading of the statute, an accused either has thirty days following his arrest to demand a preliminary hearing, or else he has an absolute right to a preliminary hearing within thirty days of his arrest, upon demand. A demand would be a prerequisite to receiving a preliminary hearing under either construction.
Stated another way, the problem in a nutshell is whether an accused has an absolute right to a preliminary hearing within thirty days of his arrest, upon making timely demand for one within that same thirty day period, or whether he simply has thirty days from the time of his arrest to demand a preliminary hearing. If the latter interpretation is adopted, a second problem develops as to when the preliminary hearing must be set after timely demand has been made. It is certain that the statute cannot be read to mean that an accused has a right to demand a preliminary hearing within thirty days of his arrest and also have the hearing set within thirty days of his demand; that is so because two separate thirty day time frames are not provided for in Section 15-11-1.[3] The remaining alternative, *195 under the latter interpretation above, would be to find that if demand is made for a preliminary hearing within thirty days of arrest, the preliminary hearing must be held within a reasonable time following the demand.
We are mindful that in Duncan v. State, 369 So.2d 885, 887 (Ala.Cr.App.1979), a majority of this court held that where an indictment has been returned against the accused, no reversible error results in subsequently denying the accused a preliminary hearing: the rationale being that there is no constitutional requirement in Alabama for two inquiries into probable cause.[4] In Duncan, supra and Hale v. State, 355 So.2d 1158 (Ala.Cr.App.1978) (which also dealt with Section 15-11-1, but was not determined under the Duncan rule), the accused was indicted well within thirty days of his arrest. Here, however, appellant was indicted thirty-three days after his arrest and twenty days following his demand for a preliminary hearing. Depending on how the "30 day" period in Section 15-11-1 is construed, and by using Rule 5.1(a) of the Proposed Alabama Rules of Criminal Procedure as persuasive authority, Duncan, carried to its logical extreme, works to negate any requirement that appellant should have received a preliminary hearing in the instant case.[4]
In Mobile County Republican Executive Comm. v. Mandeville, 363 So.2d 754, 757 (Ala.1978), our Supreme Court held that, when the plain meaning of a statute can be gleaned from its words, it should be so construed, but where, because of ambiguous language or otherwise, the meaning is not clear on the face of the statute, it is the duty of the courts to determine its meaning. While criminal statutes are to be strictly construed in favor of the accused, Clements v. State, 370 So.2d 723 (Ala.1979), determining legislative intent is of crucial importance in deciphering the meaning of any statute not otherwise clear on its face. Mandeville, supra.
With these principles in focus, we believe the "30 days" in Section 15-11-1 means that an accused has thirty days following his arrest to demand a preliminary hearing. If the accused makes such a demand within thirty days of his arrest, the preliminary hearing must be held within a reasonable time following his demand; however, based on Duncan and the persuasive authority of Rule 5.1(a)(4) of the Proposed Alabama Rules of Criminal Procedure, if an indictment is returned against the accused within that reasonable time, charging the same offense, the accused is no longer entitled to a preliminary hearing. This construction of Section 15-11-1 recognizes fully the legislative intent that an accused be given an inquiry into probable cause within a reasonable time of his arrest. In the case at bar appellant was indicted twenty days after his demand for a preliminary hearing. It is our opinion that twenty days is a reasonable time for an indictment to be returned which can act to cut off the need for a preliminary hearing per Duncan. This construction comports exactly with the directions in Proposed Rule 5.1(a)(4) and is in harmony with the principles negating any constitutional requirement in Alabama that there be two inquiries into probable cause. Duncan, 369 So.2d, at 887.
We believe that the legislative intent would be defeated, if, as appellant argues, the "30 days" in Section 15-11-1 was construed to mean that an accused, upon demand, has an absolute right to a preliminary hearing within thirty days of his arrest. If appellant's position were accepted, the very real possibilities of an administrative nightmare become apparent: every accused would have the option of waiting until the twenty-ninth or even thirtieth day following his arrest to demand a preliminary hearing. Compliance with such demands *196 clearly would force unreasonable time limitations upon the courts to provide the hearing. Assuredly, in this day of burdened dockets the legislature did not intend to impose any such last second timetables on the judiciary. Moreover, laying administrative practicalities aside, it is difficult to fathom what useful purpose would be served, or how an accused's substantial rights could be preserved, by requiring an overnight or immediate preliminary hearing. It is only logical that the legislature, in enacting Section 15-11-1, intended that the trial court have some amount of time, a reasonable time, to set a preliminary hearing after the accused demands one. Indeed, Proposed Rule 5.1(a) definitively provides for this very concept.
While appellant's interpretation of Section 15-11-1 is a possible and proper one from a standpoint of pure linguistics, faced with the stark realities of administrative limitations, we have no alternative but to interpret § 15-11-1 in favor of the State's position. Certainly, the legislature did not intend to require the impossible of our courts by enacting that statute. We fully recognize that criminal statutes must be strictly construed in favor of those sought to be subject to their operation; however, the interests of justice demand that criminal statutes not be construed irresponsibly. Unfortunate language or phrases within a statute, such that more than one interpretation is possible syntactically, does not sanction a construction of that statute at odds with common sense and practicality of application. Our interpretation of the "30 days" described in Section 15-11-1 insures that an accused's substantial rights are at all times protected.
In summary, we do not see how appellant could have been prejudiced by receiving an inquiry into probable cause within twenty days of his demand for a preliminary hearing. In light of the statute's intended purpose of providing an accused an inquiry into probable cause, per Duncan, no harm could have occurred since appellant was indicted within a reasonable time of his demand for a preliminary hearing. We hold, therefore, that appellant's petition for writ of mandamus for the District Court to provide a preliminary hearing was properly denied. In light of the foregoing discussion we find the State's construction of Section 15-11-1 to be correct.
Appellant next contends that the trial court erred to reversal in overruling his motion to strike certain jurors for cause due to their affirmative response to the following questions during their voir dire examination:
"1. Do you believe that a psychologist cannot through interviewing and testing determine the sanity or insanity of an individual at a point in time some four months prior to the interviewing and testing?
"2. Do you believe that insanity pleas are gimmicks used by defense lawyers?"
The record demonstrates that eleven prospective jurors responded affirmatively to question one and that those same jurors plus one additional juror responded affirmatively to question two. Appellant alleges that the trial court abused its discretion in refusing to strike those jurors for two reasons: one, the jurors' answers show that they had fixed opinions as to his guilt; and, two, their answers indicated a bias against his insanity defense.
In support of his argument, appellant relies on Christian v. State, 351 So.2d 623 (Ala.1977); Graham v. State, 383 So.2d 892 (Ala.Cr.App.), cert. denied, 383 So.2d 895 (Ala.1980), and Woods v. State, 364 So.2d 1178 (Ala.Cr.App.), cert. denied, 364 So.2d 1186 (Ala.1978), for the following proposition: the question of insanity at the time of commission of a crime is a matter to be determined by the jury from a consideration of all the evidence; and while a jury may reject all expert testimony in making its determination, though it is without conflict, the jury may not arbitrarily ignore opinion testimony of experts in insanity cases, but must weigh those opinions with all the other evidence. Appellant contends that affirmative responses to the two questions set out above demonstrate a predisposition to arbitrarily ignore expert testimony *197 on the issue of his insanity at the time of the commission of the crime. While there is some rationale to appellant's arguments, we cannot find, as a matter of law, that the trial court abused its discretion in permitting the complained of jurors to remain on the jury venire.
Ala.Code § 12-16-150 (1975) provides a statutory list of grounds for which a juror may be challenged for cause by either party. Contained within that list is § 12-16-150(7), relied upon by appellant, which states that a challenge for cause lies where a juror "has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict." In addition to the grounds for challenge for cause under § 12-16-150, grounds for challenge for cause under the common law still exist, when not inconsistent with the section. Mullis v. State, 258 Ala. 309, 62 So.2d 451 (1952); Felton v. State, 46 Ala.App. 579, 246 So.2d 467 (1971).
It is evident that the jurors appellant challenged for cause did not have a "fixed opinion" as to his guilt or innocence. A "fixed opinion" which will bias a verdict is one that is a conviction or prejudgment, a strong or deep impression which closes the mind of a juror and combats the testimony and resists its force. Fuller v. State, 269 Ala. 312, 113 So.2d 153, 161 (1959), cert. denied, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960). In Peterson v. State, 227 Ala. 361, 150 So. 156, 159 (1933), cert. denied, 291 U.S. 661, 54 S.Ct. 439, 78 L.Ed. 1053 (1934), our Supreme Court said:
"What is said in Long v. State, 86 Ala. 36, 5 So. 443, 447, finds application here: "`While some of the expressions in the opinions may not be sufficiently limited or qualified for use as general definition, the following may be deduced from the cases, when compared with each other, as expressing the meaning of a fixed opinion which would bias the verdict. The mere formation of an opinion, founded on rumor or hearsay, which is subject to change on hearing the evidence, and leaves the mind of the juror free to impartially consider the whole evidence, without giving undue credence to that which tends to prove the facts as heard, and to apply to the evidence the law as pronounced by the court, is not sufficient to disqualify. But an opinion, whether founded on rumor or conversations with witnesses, or on observation, which is a conviction, a prejudgment, disqualifying the juror to impartially consider the whole evidence,that which tends to prove the facts as heard, as well as that which contradicts or explains,and to apply free from bias the law as given in charge by the court, is a fixed opinion which will bias the verdict. The mind of the juror should be in such a state of freedom, that he is capable of giving to the accused the weight of the presumption of innocence, and the benefit of a reasonable doubt. The statute affirms, in concise, intelligible, and comprehensive language, the common-law rule, as declared by Chief Justice Marshall in Burr's trial. "That light impressions, which may fairly be supposed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of that testimony, constitute no sufficient objection to a juror; but those strong and deep impressions, which will close the mind against the testimony that may be offered in opposition to them, which will combat that testimony, and resist its force, do constitute a sufficient objection to him."
"`The sufficiency of the cause of challenge is determined by the trial court, and the inquiries are addressed to the conscience of the juror under oath. He is examined touching his qualifications, in the presence of the judge, who sees his manner of answering the questions, and the probing of his conscience, which is often times more clearly indicative of his disinterestedness or bias, than the mere words used. The reviewing court, therefore, should exercise caution, and the finding of the trial court should not be set aside, unless it affirmatively appears, that, on the answers of the juror, taken as a whole, he entertained a fixed opinion which would bias his verdict.'" (Emphasis added.)
*198 Moreover, as was stated by this court in Tidmore v. City of Birmingham, 356 So.2d 231, 234 (Ala.Cr.App.1977), cert. denied, 356 So.2d 234 (Ala.1978): "[t]o disqualify a prospective juror, he must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused. Such opinion must be so fixed as that it would bias the verdict a juror would be required to render." (Emphasis added.)
Initially, it must be noted that the trial court asked the prospective jurors specifically, "Do any of you have a fixed opinion as to the guilt or innocence of this defendant?" No affirmative response was made by any prospective juror. Their silence at this point demonstrates unequivocally that none of the jurors had a predisposition or fixed opinion, one way or other as to appellant's guilt or innocence. Neither can it be said that in the affirmative responses to the two questions, in the light of Christian, supra, and its progeny, we find any indication that those prospective jurors would arbitrarily ignore expert testimony dealing with the issue of appellant's insanity in rendering a verdict, much less that they had a fixed opinion to arbitrarily ignore such testimony. At most, those prospective jurors' answers demonstrate skepticism as to a psychologist's ability, given a unique set of facts, to determine a person's sanity, and as to why some insanity pleas might be made. Clearly, these expressions of skepticism cannot be held to constitute, in any fashion, a fixed opinion of appellant's guilt, or innocence, to an extent which would bias the verdict the prospective jurors would be required to render.
Since the prospective jurors did not exhibit a fixed opinion as to the guilt or innocence of appellant which would bias their verdict, appellant's ground for challenge must rest on common law. Thomas v. State, 373 So.2d 1167, 1169 (Ala.1979). When a common law ground is at issue there must be a showing of absolute bias leaving nothing to the discretion of the trial court, or there must be a mixed question of law and fact to be determined by the trial court exercising its sound discretion. Thomas, supra; Mullis v. State, 258 Ala. 309, 62 So.2d 451 (1952). We find that this case presents a matter within the discretion of the trial court. A trial court's ruling on challenges for cause based on bias is entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion. Price v. State, 383 So.2d 884 (Ala.Cr.App.), cert. denied, 383 So.2d 888 (Ala.1980); Motes v. State, 356 So.2d 712 (Ala.Cr.App.), cert. denied, 356 So.2d 720 (Ala.1978). Appellant's allegations fall far short of proving absolute bias and there can be no contention that the juror's responses constituted probable prejudice as defined in Grandquest v. Williams, 273 Ala. 140, 135 So.2d 391 (1961), and cases cited therein. Based on the foregoing principles, we cannot say, as a matter of law, that the trial court abused its discretion in overruling appellant's challenges for cause.
Appellant's third contention of error is the insufficiency of the State's evidence. Appellant particularly stresses that he was insane at the time of the commission of the crime. A review of the facts proves these arguments to be without merit.
As has been stated a number of times, this court is required to review the evidence presented in the light most favorable to the State Bass v. State, 55 Ala.App. 88, 313 So.2d 208 (1975), and not substitute its judgment for that of the jury. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979). It is not the function of this court to reweigh the evidence, but to accord all legitimate evidentiary inferences to the State. Johnson v. State, 378 So.2d 1164 (Ala.Cr.App.), cert. quashed, 378 So.2d 1173 (Ala.1979).
Ms. Maureen Anakwe was called as the State's first witness to establish the corpus delicti. The deceased was her younger sister. Ms. Anakwe stated that she and the deceased were citizens of Nigeria in Africa and that they were attending Alabama A & M University in Huntsville at the time the deceased was killed. Appellant is also a Nigerian. Ms. Anakwe knew the appellant to be the deceased's boyfriend. She was not aware appellant and the deceased were *199 having any problems and never observed them have any fights.
Ms. Casandra Arthur testified that she knew appellant and the deceased at A & M and had a telephone conversation with the deceased at about 12:45 a. m. on October 13, 1979. Ms. Arthur had planned to see the deceased later that afternoon.
Ms. Linda Ola, the deceased's roommate at A & M, testified that she was also a citizen of Nigeria and that she knew appellant as the deceased's boyfriend. Appellant frequently spent the night with the deceased and could let himself into their apartment. Appellant and the deceased also shared the same car. They had lived together for approximately ten months.
Ms. Ola testified that she left work at 1:00 p. m. on October 13 and went to her apartment. As she walked through the living room going to her bedroom Ms. Ola heard the deceased call her name. She went to the deceased's bedroom door, but found it locked. Ms. Ola did not hear any struggling, but, when she went to her bedroom to call the police, she discovered she could not make any calls out. Ms. Ola stated that, as she was thinking about what to do next, appellant came into her bedroom and told her he had killed the deceased and that she "should run look at her body on the floor." Ms. Ola stated that appellant "looked mean" and "was sweating." Ms. Ola further stated that appellant told her she would be a "third party" if she didn't take a look at the deceased's body.
Ms. Ola testified that, when she saw the deceased lying on the floor, appellant did not say anything. "He was just passing about the apartment." When she asked him what happened, appellant told her, "How could the girl I love wouldn't love me?" Appellant then told Ms. Ola not to call the police until he had killed himself; "he was asking me for poison or anything he could take to kill himself...."
Ms. Ola stated that appellant next ran downstairs and got a gallon of anti-freeze from the trunk of his car. This gave Ms. Ola an opportunity to run to the next building and call the police. Ms. Ola saw appellant take the anti-freeze back upstairs, but she didn't see him actually drink any.
In addition, Ms. Ola testified on cross-examination that she knew appellant and the deceased had had "misunderstandings," but that she had never seen "physical combat" between the two. On one occasion Ms. Ola saw a "big hole on the wall" in the deceased's bedroom which the deceased told her resulted from a "quarrel." Ms. Ola never saw the deceased use a knife on appellant: "Most of the time they would normally be in the bedroom when they had a physical combat, or when I wasn't home, so I really don't know much about that."
Ms. Ola further stated that appellant was not crying or screaming when he told her he had killed the deceased, but that his voice was very emotional. Ms. Ola observed a cut on appellant's shoulder and on the palm of one of his hands. She did not see appellant with a knife, but saw one on the floor beside the deceased. The knife was Ms. Ola's kitchen knife and was bloody.
Mrs. Brenda Bradford Morris of Emergency Medical Services, Inc., testified that appellant walked over to her and her partner when they arrived on the scene and led them upstairs to the deceased. The deceased had blood on her face and showed no signs of life. Mrs. Morris bandaged a superficial cut on appellant's wrist and asked him what happened. Appellant "stated that he had had a bad fight." Mrs. Morris stated that appellant was sitting in a chair very calmly. "[H]e had a look on his face to me like a child that had been frightened." Mrs. Morris testified that appellant may have been in shock, but was not acting wild. Appellant calmly told her he had drunk lighter fluid and anti-freeze and later got into the ambulance by himself. On the way to the hospital appellant told Mrs. Morris she "didn't need to be afraid of him, he said that he was not usually this way."
James Parker, a crime scene technician with the Huntsville Police Department, testified that he arrived at the scene at 2:05 p. m. and made photographs and diagrams at the scene. A number of exhibits pertinent *200 to the crime scene were admitted into evidence during his testimony.
James Kilbourn, a toxicologist with the Alabama Department of Forensic Sciences, performed an autopsy on the body of the deceased and determined the cause of death to be hemorrhage due to stab wounds to the neck and chest. Mr. Kilbourn testified that the deceased had been stabbed and cut numerous times. The wounds were concentrated, but not confined, to the deceased's head, neck and chest. Mr. Kilbourn further stated that many of the wounds, including one wound which could have been fatal, could possibly have been made with State's Exhibit 8, the kitchen knife found lying beside the deceased. It was Mr. Kilbourn's opinion that several of the wounds could not have been made with State's Exhibit 8.
At the conclusion of Mr. Kilbourn's testimony the State rested its case and appellant's motion to exclude was overruled.
Appellant called as his first witness a psychologist, Dr. John C. McMillan of the Huntsville Madison County Mental Health Center. Dr. McMillan testified that he examined appellant on January 24 and February 19, 1980, and administered psychological testing. Based on his interviewing and testing, Dr. McMillan was of the opinion appellant was "suitable to stand trial," but "not competent at the time of the commission of the crime." Dr. McMillan testified that at the time the tests were administered appellant was "not legally insane, he was not crazy, he was not paranoid, he was not a manic depressive.... Essentially he has no mental psychological or psychiatric history."
Appellant related in detail to Dr. McMillan the events preceding the deceased's death, his general relationship with the deceased, and three previous knife attacks which the deceased had initiated against him. Appellant told Dr. McMillan that on prior occasions when the deceased had become violent "he had managed to either talk her down or get the knife away from her. On one of those occasions he indicated that he actually received two knife wounds."
Appellant then described with particularity to Dr. McMillan the misunderstanding he and the deceased had the day he killed her. Appellant and the deceased had been arguing over whether she would take him to work or not. For the sake of clarity we here include portions of Dr. McMillan's testimony:
"She still refused to take him to work, and he said to her, `I will not trek to work,' meaning he would not walk to work. He indicated that it was at that point that she drew her hand out from under some covers on the bed, that she was sitting on the bed, and that she attacked him furiously with a knife.
. . . .
"After she pulled it out, he says that she came toward him. By this time he had moved away from the door during the conversation and she was now between him and the door leading from the bedroom, that she was slashing with the knife furiously. And he made a slashing motion like this, that he was warding off the blows, the stab blows, that he was hit on the hand, and that he was hit in the shoulder.
. . . .
"He said there was a tremendous amount of blood, his blood, and that when he saw his own blood he thought he was bleeding to death, that a vessel, an important vessel had perhaps been cut, and that he was dying.
. . . .
"He indicates that he does not remember actually taking the knife away from her, although he says he did in some way, and he indicated to me that he could not remember, could not visualizecould not remember visually any of the stab blows that he delivered to her.
. . . .
"[H]e believed that he killed her.
. . . .
"I asked him how many [stab blows] that he would have estimated that he had delivered, and he said that he would have estimated four or five. He indicated to *201 me that he had already been informed that it was in the neighborhood of 30 to 35, and he was very surprised."
In conclusion, Dr. McMillan gave his opinion that appellant had experienced an acute psychotic reaction and an acute schizophrenic reaction prior to stabbing the deceased, and that he was not responsible or able to appreciate the criminality of what he had done at the time he committed the offense. Dr. McMillan further stated that appellant did not "regain" his sanity until he left the hospital, some 48 to 72 hours after the killing.
Kirk Landau, a third year medical student at the University of Alabama, testified that he saw appellant in the Huntsville Hospital emergency room on October 13, 1979, and sutured wounds on appellant's left shoulder and right hand. Mr. Landau testified that appellant had already received a gastric lavage of his stomach to absorb any toxins he had injested. Mr. Landau stated that appellant was "very agitated that evening," that at one point he commented that the laboratory technician was his girl friend, and that at another point, "he asked his mother for forgiveness for what he had done," though his mother was not at the hospital.
Three professors at Alabama A & M, two school administrators, three fellow students and a vice president of a Huntsville bank testified generally as to appellant's good reputation in the community and as to his good reputation for truth and veracity. The professors and school authorities considered appellant an exceptionally bright student. In most of his classes he made all A's.
Appellant next testified in his own behalf. He stated that he first met the deceased in the fall of 1977 when she arrived at the A & M campus from Nigeria. They had a close relationship, shared their personal belongings and were together almost every day. Appellant testified that he and the deceased occasionally had fights, and then described in some detail the altercation that erupted on October 13, 1979, which resulted in his girl friend's death. Appellant's in-court narration of what happened was substantially similar to the account he gave to Dr. McMillan. He specifically remembered using State's Exhibit 8 to kill the deceased and of continuing to use "the knife on her until she fell." "I don't think I used another knife." Appellant also admitted drinking lighter fluid and anti-freeze in an attempt to commit suicide after killing the deceased, and recollected having his stomach pumped out at the emergency room. Following appellant's testimony the defense rested its case.
Appellant's employer, Joel Beasley, testified in rebuttal that appellant came in about 11:45 a. m., fifteen minutes before he was scheduled to work. Appellant told Mr. Beasley that he was sick and wanted to go to the hospital and then left. "He appeared tired, worn or something like that." Mr. Beasley classified appellant as a dependable "good worker" and stated that in his opinion appellant was sane.
Officer Dewey Miller of the Huntsville Police Department stated that he observed appellant at the scene and that appellant refused to say anything except that he "drank some anti-freeze and brake fluid and wanted to go to the hospital." Officer Miller testified that appellant was not jumping around wildly, frothing at the mouth, waving his arms, or doing anything to indicate to him that he was irrational.
Dr. Robert Dean Taylor, a resident physician at Huntsville Hospital, saw appellant on October 13, 1979, and found him to be in stable condition. "During the encounter I had with Mr. Nobis, he was rational and cooperative with me during my examination and my treatment of him in the emergency room." Dr. Taylor found appellant alert, oriented as to time and place and cooperative. Appellant told Dr. Taylor he had killed his girl friend and appeared depressed. "I personally did not see him have any hallucinations or hear him verbalizing any ..." Dr. Taylor further stated that appellant spoke rationally at all times, had no problems making himself understood and was "in control of himself." In Dr. Taylor's opinion, appellant was sane and knew right *202 from wrong at the time he saw him at the hospital.
Jerry Hammonds of the Huntsville Police Department testified that he saw appellant in the Huntsville Hospital emergency room. After being given his Miranda warnings, appellant told Officer Hammonds that he did not want to talk and asked for an attorney.
Based on the foregoing recitation of facts, there can be no doubt that each element of second degree murder was firmly established. Ala.Code § 13-1-70 (1975); Miller v. State, 145 Ala. 677, 40 So. 47 (1906); Ezell v. State, 103 Ala. 8, 15 So. 818 (1894); Smith v. State, 380 So.2d 345 (Ala. Cr.App.1980); Commander v. State, 374 So.2d 910 (Ala.Cr.App.1978), cert. denied, 374 So.2d 921 (Ala.1979).
Moreover, in applying the principles of law which are outlined in Christian v. State, 351 So.2d 623 (Ala.1977) and its progeny to the facts in this case, we cannot hold, as a matter of law, that the jury arbitrarily chose to ignore expert testimony on the question of appellant's insanity. Appellant did not present overwhelming testimony such as would overcome the presumption of his sanity. Instead, conflicting evidence was presented on the question of his sanity both by expert and lay witnesses. We think the preponderance of the evidence demonstrates that appellant was sane at the time he killed the deceased. Clearly, in this case the question of whether appellant was sane or insane at the time of the commission of the offense was for the jury to decide. Their verdict is entitled to great weight. Christian, supra.
During closing argument the District Attorney made the following remark which appellant alleges should cause a reversal of this case:
"MR. SIMPSON: They would have them change the laws so they can spend time in a mental institution and then be excused for their crime."
Appellant made a general objection to this "line of argument" which was overruled by the trial court. Appellant made no other objection to any part of the State's argument. Indeed, no other part of the State's closing argument appears in the record. We are called upon to either affirm or reverse this cause based on this one statement.
Appellant contends in the first instance that the District Attorney's remark was so grossly improper as to have caused ineradicable error, even had he failed to make objection. Christian, supra; Allred v. State, 291 Ala. 34, 277 So.2d 339 (1973). Appellant next argues that should the District Attorney's remark not be found to come within the ineradicable error rule, his timely objection was due to be sustained. Appellant cites Dunn v. State, 277 Ala. 39, 166 So.2d 878 (1964); Boyle v. State, 229 Ala. 212, 154 So. 575 (1934); and Whisenhant v. State, 370 So.2d 1080 (Ala.Cr.App.), cert. denied, 370 So.2d 1106 (Ala.1979) as examples where reversible error has occurred because of the trial court's failure to sustain objections to improper argument by the State. Appellant also cites Meredith v. State, 370 So.2d 1075 (Ala.Cr.App.), cert. denied, 370 So.2d 1079 (Ala.1979), as an example where reversible error would have occurred but for the trial court's sustaining the defendant's objection.
We find the facts in the cases cited by appellant to be distinguishable from the facts before us. Initially, it must be pointed out that the District Attorney's remark here does not constitute ineradicable error. The remark comes nowhere close to those statements condemned in Christian, supra and Allred, supra. Secondly, in each case relied upon by appellant the objectionable remarks make personal reference to the accused. There is no doubt in those cases as to whom the District Attorney was referring. In this case the remark objected to makes no personal reference whatsoever. Neither appellant's name nor the word "defendant" appears in the statement. The subject of the remark, "They", is indefinite as to its reference and could refer to any number of people. Thirdly, in many of the cases cited by appellant the objectionable remarks were emphasized by repeated improper *203 argument along the same vein. Here, even though the objection to the remark was overruled, there is no indication that the District Attorney continued in an improper line of argument.
In fact, so little of what the District Attorney said has been recorded for our review that the context of the remark cannot be ascertained. In this sense appellant's objection was fragmentary. McClary v. State, 291 Ala. 481, 282 So.2d 384 (1973); Williford v. State, 365 So.2d 1257 (Ala.Cr. App.1978) cert. denied, 365 So.2d 1258 (Ala. 1979). In McClary, supra, our Supreme Court quoted with approval the following language found in Gray v. State, 19 Ala. App. 550, 98 So. 818, 819 (1924):
"The remarks of the solicitor to which exceptions were reserved are too fragmentary to present the questions insisted upon ... in order for this court to intelligently pass upon the question, enough of the remarks of the solicitor must be incorporated in the record to inform the court as to what was really said, and not mere disjointed sentences of the solicitor's speech." (Emphasis added.)
Without more of the District Attorney's argument before us for review, we cannot hold that the trial court erred to reversal in failing to sustain appellant's objection. We believe application of Rule 45, Alabama Rules of Appellate Procedure, to be appropriate in this particular case.
After carefully examining the record we find no merit to appellant's cumulative error argument. As was stated in Arant v. State, 232 Ala. 275, 167 So. 540, 544 (1936), "a trial is a legal battle, a combat in a sense, and not a parlor social affair."
We have considered each issue raised by appellant. In addition, we have searched the record, as required by law, for errors injuriously affecting the substantial rights of the appellant and have found none. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur, except BOWEN, J., who concurs in part and dissents in part with opinion.
BOWEN, Judge, concurring in part and dissenting in part.
With regard to the matter of a preliminary hearing, I agree that the "30 days" of Section 15-11-1 means that an accused has thirty days following his arrest to demand a preliminary hearing. However, I strongly disagree with the following holding of the majority opinion.
"If the accused makes such a demand within thirty days of his arrest, the preliminary must be held within a reasonable time following his demand; however, based on Duncan and the persuasive authority of Rule 5.1(a)(4) of the Proposed Alabama Rules of Criminal Procedure, if an indictment is returned against the accused within that reasonable time, charging the same offense, the accused is no longer entitled to a preliminary hearing."
I adhere to my dissent in Duncan v. State, 369 So.2d 885, 888 (Ala.Cr.App.1979).
Since the majority of this Court finds persuasive Rule 5.1(a)(4) of the Proposed Rules of Criminal Procedure, it would do well to recall and consider the last paragraph in the "Comment" following the rule.
"While Section 4-106(f) of Act 1205, Regular Session 1975 (Section 15-11-1, Code of Ala.1975), requires a preliminary hearing in all cases unless waived, this requirement has been modified by the addition of Rule 5.1(a)(4), which precludes preliminary hearings being held after return of an indictment. The resulting denial to defendants of an absolute right to the discovery mechanism of a preliminary hearing is adequately offset by other rules which provide defendants with formal methods of discovery designed to eliminate trial `by ambush' and by expanded pre-trial motion practice."
Through such interpretation the majority renders conditional an absolute. It gives new meaning to the word "absolute" which is defined as "complete and unconditional; having no encumbrances; final." The American Heritage Dictionary of The English Language (1969); 1 C.J.S. Absolute p. 373 (1936). Under this construction, the *204 legislature must now enumerate every instance when "absolute" actually means absolute or else it runs the risk of having the word transposed into the conditional. Under such a principle of statutory construction all words lose their plain and clear meaning.
By interpreting the "absolute" guarantee of Section 15-11-1 as conditional, the majority has denied the accused an important right the legislature obviously thought he should have. Under the guise of the "stark realities of administrative limitations", this Court has denied the defendant a clear statutory right. With due respect to the majority, their interpretation of Section 15-11-1 violates and misapplies fundamental rules of statutory construction and overlooks or ignores the fact that discovery is an important tool for defense counsel. Their construction destroys confidence in the judicial system for if "absolute" is conditional, then always can mean never and never mean sometimes. The legislature gave the accused an absolute right to a preliminary hearing. Like it or not, we must afford him that right.
While I concur in the remaining portion of the majority opinion, I must respectfully but strongly dissent as indicated.
NOTES
[1] Judge McCoy and appellant's lawyers incorrectly stipulated that appellant was arrested on October 15. The evidence is overwhelming that appellant was, in fact, arrested October 13 as set out above. Because appellant was eventually denied a preliminary hearing altogether, whether he was arrested on October 13 or 15 is not critical to a resolution of the issues in this particular case.
[2] Monday, November 12, 1979, the thirtieth day following October 13, was a State holiday commemorating Veteran's Day.
[3] This problem in Section 15-11-1 is partially recognized and remedied by Rule 5.1(a) in the June 1, 1977 draft of the Proposed Alabama Rules of Criminal Procedure, which reads, in part, as follows:

"A defendant charged by complaint with the commission of a felony may demand a preliminary hearing within 30 days after arrest. If demanded the preliminary hearing shall commence in district court within 20 days following the demand for preliminary hearing unless:
. . . .
(4) an indictment charging the same offense has been returned by the grand jury."
The proposed rules, however, are in no way binding, but can only be looked at as persuasive authority by this court.
[4] See also State ex rel. Graddick v. Russell, 373 So.2d 656 (Ala.Cr.App.1979); Brown v. State, 392 So.2d 1248 (Ala.Cr.App.1980), cert. denied 392 So.2d 1266 (Ala.1981).